**D.P. MUTH; J.P. Muth, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 92–2414.

United States Court of Appeals, Fourth Circuit.

Argued March 31, 1993.

Decided August 6, 1993.

Gary Edward Pullin, Cleek, Pullin & Bibb, Charleston, WV, argued (Travis S. Haley, on brief), for plaintiffs-appellants.

Paul Lee Yanowitch, Civil Div., U.S. Dept. of Justice, Washington, DC, argued (Stuart M. Gerson, Asst. Atty. Gen., Michael W. Carey, U.S. Atty., Donald L. Stennett, Asst. U.S. Atty., J. Patrick Glynn, Director, Torts Branch, Joann J. Bordeaux, Deputy Director, Torts Branch, Christina M. Humway, Civil Div., U.S. Dept. of Justice, on brief), for defendant-appellee.

Before RUSSELL and LUTTIG, Circuit Judges, and HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

HILTON, District Judge:

Appellants D.P. Muth and J.P. Muth bring this appeal from an order of the district court granting summary judgment to appellee United States, on the grounds that the statute of limitations for this action, pursuant to the Federal Torts Claims Act (FTCA), 28 U.S.C. § 2401(b), has expired. 804 F.Supp. 838. Appellants also appeal the district court's dismissal of J.P. Muth according to Federal Rule of Civil Procedure 12(h)(3), for failure to fulfill a jurisdictional prerequisite. We affirm.

Appellants D.P. Muth and J.P. Muth own approximately 20 acres of land near the center of what was an 8000 acre complex known as the West Virginia Ordnance Works (WVOW). The WVOW produced trinitrotoluene (TNT) from 1942 until 1945. Following efforts to clean up any areas contaminated by TNT by-products, parcels of the WVOW were sold to private individuals. D.P. Muth obtained 20 acres of property through four separate conveyances from the United States over the course of four decades.[1] Each conveyance was originally to Mason Furniture Company (MFC), a business operated by D.P. Muth from 1948 until 1976. In 1988, MFC deeded all four parcels, totalling the twenty acres, to D.P. and J.P. Muth.

By May of 1981, certain areas of the former WVOW were found to be contaminated with by-products of the TNT manufacturing process. After an investigation, the Environmental Protection Agency (EPA) listed the WVOW on its National Priorities List.[2] The USATHMA conducted a remedial investigation of the site from 1984 until 1986, and in 1986 published and disseminated the Remedial Investigation Final Report (RIFR). The RIFR showed no nitroaromatic contamination of the Muths' water wells, but did document contamination in areas within one quarter mile of their property.[3]

During 1989 and 1990, a supplemental investigation of the WVOW was conducted,

[1]. The first parcel of 5.197 acres was purchased by Mason Furniture Company (MFC) directly from the United States in 1948. In 1951, MFC purchased an additional .477 acres directly from the United States by quitclaim deed. In 1966, MFC purchased the surface rights to an additional 5.026 acres from G.P.B. Trading Company; G.P.B. had obtained ownership through a 1961 conveyance from Jerome and Alta Goldberg, who, in turn, had obtained their title from the United States earlier in 1961. The 1961 deed to the Goldbergs contained language clearly indicating that the property was formerly a part of the West Virginia Ordnance Works established in 1943, and was developed for the manufacture and production of TNT.

[2]. The United States Army's Toxic and Hazardous Materials Agency (USATHMA) was designated as the agency responsible for investigation and remediation at the WVOW.

[3]. Following the discovery of the contamination, the appellee held four public meetings, which received considerable news coverage, to address concerns regarding possible contamination and to solicit community input and comment.

which included taking over 22 soil and water samples [4] from appellants' property. Again, the USATHMA concluded in its 1991 Supplemental Investigation Final Report (SIFR) that neither the soil nor water samples from appellants' property showed signs of nitroaromatic contamination.

Beginning in September 1988, and continuing through August 1992, appellant D.P. Muth corresponded with the Army, the EPA and various elected representatives on matters relating to contamination discovered at the WVOW site. In at least three letters written to the government *before* July of 1989—more than two years before the administrative claim was filed—the appellant explicitly indicated that he knew the former use of his property, that contaminants had been discovered at property adjacent to and surrounding his property, and that, as a result, his property had been rendered worthless.

In his first correspondence with the government, dated September 19, 1988, D.P. Muth wrote to the Army and the EPA, requesting that the Army check his property for contamination. Muth specifically noted in the letter that his property was located near or adjacent to sites where contaminants were detected. He advised the government that he knew that a facility used in the TNT production process, the sellite plant, had been located on his property. Muth further stated that he was aware that the Army had sampled the water supply wells on his property, and had installed numerous test wells on the WVOW site. He in fact noted, "the [Army contractor] ... used my property as their base of operations." Finally, Muth admitted in the letter that he knew that the value of his property had been affected by the discovery of contamination: "This past week I offered my property for the new industrial park and I was told by the management of the present industrial park that property in the old TNT plant site was not desirable for any industry...."

In early November 1988, both the EPA and the Army responded to D.P. Muth's inquiries. Both agencies advised the appellant of the pertinent results of the aforementioned remedial investigation, indicating that no explosives-related contaminants had been detected on his property, and explaining in detail the basis for their conclusion that there was no potential for future contamination of Mr. Muth's property from nearby sites at which contaminants had been detected. The Army reminded Mr. Muth that the results of samples drawn from the wells on his property had been supplied to him by the State of West Virginia in *July of 1985.*

On December 5, 1988, Mr. Muth again wrote to the Army requesting that it provide a letter stating that the property was not a "hazardous situation." Mr. Muth stated that, "I have made a direct offer to the Mason County Development Authority ... to consider my property for the future industrial site. They immediately advised me that they consider any property of the old West Virginia Ordnance Works as *undesirable for anything.*" (Emphasis added.) Mr. Muth also reported that he had offered to sell or lease his property, but "the real estate people informed me it will be difficult to dispose of this property because of contamination found on the former West Virginia Ordnance site." On January 9, 1989, Mr. Muth wrote to Senator Byrd regarding the Army's purchase of the Mason County Industrial Park, which was located adjacent to his property. Mr. Muth acknowledged that he was aware that the Army had purchased the Industrial Park because it was "hazardous and dangerous." Mr. Muth further informed Senator Byrd that, "I recently offered my property to Mason County Industrial Board for a future Industrial Park. Several members of the board have informed me that any property of the former West Virginia Ordnance Works is undesirable and unsafe for anything."

On the same date, January 9, 1989, appellant wrote to USATHMA requesting copies of the analysis of soil and groundwater samples taken from his property. On February 28, 1989, the Army responded, and enclosed copies of three reports summarizing the information known about the nature and extent of the contamination at the WVOW. Among the reports provided was the 1986 RIFR,

---

4. The sites from which the samples were taken were determined by appellant D.P. Muth.

which contained information about the use of appellant's property and surrounding land during World War II, and the analysis of samples taken from Mr. Muth's wells.

Mr. Muth continued to carry on a considerable volume of correspondence with the Army and his elected representatives after July of 1989. His correspondence during this period reveals a steady effort to convince the Army to purchase his land, which he asserted, consistent with earlier statements, was worthless.

In spite of the aforementioned correspondence, appellant D.P. Muth did not file his administrative complaint with the Army until July 19, 1991. Appellant J.P. Muth did not file an administrative complaint at all. D.P. Muth's claim was denied on September 25, 1991, and appellants filed the district court action on March 5, 1992. The complaint alleged that as a result of the negligent contamination of the WVOW in the 1940's, appellants' property diminished in value, effectively rendering it economically worthless.

The United States sought summary judgment in the district court action on the grounds that the FTCA's two-year statute of limitations for this action, 28 U.S.C. § 2401(b) (1988), had expired. The lower court found that a claim accrues under the FTCA "when the plaintiff knows, or in the exercise of due diligence, should have known both the existence and the cause of his injury." *Gould v. United States Dept. of Health and Human Servs.*, 905 F.2d 738, 742 (4th Cir.1990) (en banc), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 673, 112 L.Ed.2d 666 (1991); *see also United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). Mr. Muth argued that the cause of action was timely because he acted with due diligence and/or the principle of equitable tolling extended the time in which to file the claim. Nevertheless, the district court stated that the administrative complaint was filed with the Army in July 19, 1991, and thus if plaintiff's claim accrued prior to July 19, 1989, his action was barred by the statute of limitations, § 2401(b).

## I.

■ First, we agree with the district court's decision to dismiss appellant J.P. Muth from this case for failure to follow the jurisdictional prerequisite for this FTCA action, namely, filing an administrative claim with the appropriate federal agency. *See* 28 U.S.C. § 2675(a) (1988). The district court found, and this court agrees, that if there are multiple claimants in the matter, each claimant must "individually satisfy the jurisdictional prerequisite of filing a proper claim, unless another is legally entitled to assert such a claim on their behalf." *Frantz v. United States*, 791 F.Supp. 445, 447 (D.Del. 1992). Thus appellant J.P. Muth was properly dismissed from this case.

## II.

■ Second, this court notes that the FTCA is a limited waiver of sovereign immunity. *See* 28 U.S.C. §§ 2671–2680; *Honda v. Clark*, 386 U.S. 484, 501, 87 S.Ct. 1188, 1197, 18 L.Ed.2d 244 (1967). Among the limitations Congress placed on the consent to suit is the requirement that the plaintiff initially present an administrative claim to an appropriate federal agency within two years of the date the cause of action accrues. The FTCA explicitly provides that a tort claim is "forever barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues...." 28 U.S.C. § 2401(b); *see Gould v. United States Dept. of Health and Human Servs.*, 905 F.2d at 741. For the purposes of section 2401(b), a cause of action accrues when the plaintiff knows, or in the exercise of due diligence, should have known, first, of the existence of the injury, and second, of the cause thereof. *Kubrick*, 444 U.S. at 120, 100 S.Ct. at 358; *Gould*, 905 F.2d at 742; *Gilbert v. United States*, 720 F.2d 372, 374 (4th Cir.1983).

■ Appellant's injury was identified by the district court as the "diminution of the value of his land," and the cause of the diminution in value was characterized as the contamination of surrounding and adjacent properties. The district court properly found that appellant D.P. Muth knew of the facts constituting a cause of action greater

than two years before he filed his administrative claim. Three years before the appellant first wrote the Army, and five years before the appellant filed his administrative claim, he had more than sufficient notice of facts and circumstances that should have compelled him to undertake a diligent investigation to determine if any of his legal rights had been violated, and thus to determine the existence of any injury.

As discussed in detail above, appellant's first-hand knowledge via correspondence with various individuals, and the information contained in the deeds to the property, imposed upon him an obligation to make reasonable efforts to learn more about the contamination on surrounding properties, the effects of any such contamination, and the possibility that his own property was contaminated. *See Gould,* 905 F.2d at 745–46. A person armed with the facts known to appellant at that time, undertaking a reasonably diligent investigation, could not have avoided learning both of the claimed injury, and the cause thereof no later than February of 1989.

The appellant still argues that his claim did not arise until September 27, 1990, when the Deputy Assistant Secretary of the Army informed him that the Army would not purchase his property. Appellant claims he was not "injured" until this point. He further argues that his correspondence with government officials up to that point constitutes a reasonably diligent investigation to learn the facts underlying his claim.

Despite appellant's contentions, the cause of action accrues under the FTCA when the plaintiffs knows, or in the exercise of reasonable diligence should have known, that he is injured and of the cause of the injury. *Kubrick,* 444 U.S. at 120, 100 S.Ct. at 358; *Gould,* 905 F.2d at 742. The district court was correct in finding that once the plaintiff is in possession of these "critical facts," his cause of action accrues, and that Mr. Muth had two years from that point to develop and present the claim to the appropriate federal agency.

Correspondence between appellant and others dated from September 1988 to February 1989 demonstrates unequivocally that appellant had firsthand knowledge of both his injury, and the cause thereof, at the *latest* in February 1989—which is after the expiration of the statute of limitations. These letters clearly indicate that the property included in the old TNT plant site was undesirable and unsafe for any industry or an industrial park and that the *cause* of the injury to his property was the "contaminated nature of the adjacent properties."

### III.

Appellant tries to further wrangle its way around the statute of limitations by arguing both a "continuing injury" theory and the theory of equitable tolling of the limitations period. Appellant may not argue a "continuing injury" theory in this court because he did not raise the issue in the district court below. As this court has repeatedly held, issues raised for the first time on appeal generally will not be considered. *National Wildlife Fed. v. Hanson,* 859 F.2d 313, 318 (4th Cir.1988); *Stewart v. Hall,* 770 F.2d 1267, 1271 (4th Cir.1985); *Maynard v. General Elec. Co.,* 486 F.2d 538, 539 (4th Cir.1973). Exceptions to this general rule are made only in very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice. *National Wildlife Fed.,* 859 F.2d at 318. Appellant has not even argued that exceptional circumstances justifying departure from the general rule are present, and based on the record before this court, there are no exceptional circumstances warranting such departure.

Appellant's attempt to argue that the district court erred in not equitably tolling the statute of limitations fails as well. Appellant argues that the statute of limitations period should be tolled until March 1991—when the Army sent Mr. Muth the SIFR which indicated that low levels of a small number of chemicals had been detected on the property. Appellant alleges that based on the appellee's representations, he did not know that the property was contaminated, and thus could not have been injured prior to this date.

Appellant similarly alleges that before March of 1991, the government deliberately misled him by continually denying that his property was contaminated.

Equitable tolling is not appropriate where "the claimant has failed to exercise due diligence in preserving his legal rights," and such relief is appropriate only for the most deserving complainant. *Polsby v. Chase*, 970 F.2d 1360, 1363 (quoting *Irwin v. Veterans Administration*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). As the district court set forth in detail, plaintiff did not exercise due diligence by actively investigating the basis for his claim. To the contrary: Despite being informed that chemicals had been detected on his property; despite being informed that contaminants associated with operations at the WVOW had been detected on adjacent and surrounding properties; despite first-hand knowledge of the investigation underway on the site; despite his first-hand knowledge that WVOW operations had been conducted on his property—plaintiff took no independent steps to determine whether he had a claim against the United States. Thus, the district court did not err in finding that the appellant has no right to invoke the equitable powers of the court.

Further, the district court was correct in finding that equitable tolling would not apply for a second reason: The United States did not deliberately mislead or conceal information from the appellant. *See English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir.1987), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988). To invoke the doctrine, Mr. Muth must show that the "defendant attempted to mislead him and that the plaintiff reasonably relied on the misrepresentation by neglecting to file a timely charge." *Id.; Lawson v. Burlington Inds.*, 683 F.2d 862, 864 (4th Cir.), *cert. denied*, 459 U.S. 944, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982).

The 1991 SIFR report contains no information which is in contradiction to the first report in response to appellant's first correspondence with officials in November 1988. The SIFR documents that slightly elevated levels of several metals were found in the soil at appellant's site. It does not conclude that the contaminants are the result of WVOW operations or that they are of any environmental significance. Instead, it finds that there was no "significant soil contamination ... by military or private industrial contaminants", and that "metals detected in the [appellant's] soil samples can occur naturally in clayey soils." Notably, in the very first letter to appellant in November of 1988 the Army reported the presence of elevated levels of some levels of iron and sulfates. Similar information was provided in July of 1985 from the State of West Virginia's results of well water sampling. Given the prior information in his possession, appellant clearly cannot reasonably assert that he relied on any "misrepresentations" by the government in neglecting to file a timely claim.

## IV.

Lastly, the allegation that the United States used elevated detection levels is without merit, for there is no evidence in the record that the Army chose the detection levels in a deliberate and fraudulent effort to conceal information from the appellants.

The decision of the district court is affirmed.

AFFIRMED.